IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| LORI WHELCHEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No: 07 C 1893 |
| v. | ) | |
| | ) | Magistrate Judge Jeffrey Cole |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Lori Whelchel, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 423(d)(2). Ms. Whelchel asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.

## PROCEDURAL HISTORY

Ms. Whelchel applied for DIB on March 10, 2002, alleging that she had been disabled since May of 2002, as a result of arthritis, fibromyalgia, Cushing Syndrome, pulmonary embolism, and mental deficiencies. (Administrative Record ("R.") 62-65, 83). Her application was denied initially and upon reconsideration. (R. 331-36, 39-44). Ms. Whelchel continued pursuit of her claim by filing a timely request for hearing on December 1, 2003. (R. 44).

An administrative law judge ("ALJ") convened a hearing on September 13, 2005, at which Ms. Whelchel, represented by counsel, appeared and testified. (R. 912-967). In addition, Ms. Whelchel's husband testified, as did a vocational expert, Jennie Chin. (R. 961, 949). On April 10, 2006, the ALJ issued a decision denying Ms. Whelchel's application for DIB because, although she could not perform a full range of sedentary work due to her impairments, she retained the capacity to perform work existing in significant numbers in the national economy, such as production worker and office clerk. (R. 21-27). This became the final decision of the Commissioner when the Appeals Council denied Ms. Whelchel's request for review of the decision on February 6, 2007 (R. 6-8). See 20 C.F.R. §§ 404.955; 404.981. Ms. Whelchel has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.

## EVIDENCE OF RECORD

### A.

### Vocational Evidence

Ms. Whelchel was born on January 2, 1962, making her forty-four years old at the time of the ALJ's decision. (R. 80). She is 5' 4" and weighs 200 pounds. (R. 83). She has a high school education, but obtained that through special education classes. (R. 88-89, 924-25). She was previously found disabled due to arthritis and granted a period of disability and DIB, but managed to return to work. (R. 946-47). She got a job at Walmart, frying donuts from a premixed dough. (R. 84). Previously, she worked as a cashier and stock person, a fast food cook, and security guard. (R. 96-102). Ms.

2

Whelchel has some difficulty remembering the time frames of her various jobs. (R. 96). She was not sure whether her employment at Walmart ended in May or December of 2002. (R. 96, 920-21). At about that time she became very ill, and was fired because she missed so much work. (R. 926). At the same time, the store stopped making donuts. (R. 948).

## B.

### Medical Evidence

Ms. Whelchel suffers from a constellation of physical maladies, set forth in a jumble of medical evidence, in no particular order with pages missing or out of sequence, that makes up most of a 1000-page record. Beginning in February of 2002, Ms. Whelchel was treated by Dr. James Niemeyer at the Grundy County Pain Center for complaints of widespread numbness, mid- and low-back pain, and pain in her legs, arms and neck. (Tr. 231). Her regular treating physician at the time was Dr. McVay, and she was taking Vioxx for arthritis. (R. 231-32). On examination, her reflexes, strength, and sensation were normal. (Tr. 232-33). Range of motion of the lumbar spine was restricted to 70-75% of normal. (Tr. 233). Dr. Niemeyer diagnosed Plaintiff with widespread myofascial pain with paresthesias and possible fibromyalgia, although he did not perform the diagnostic examination for fibromyalgia (Tr. 233).[1]

---

[1] "There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and-the only symptom that discriminates between it and other diseases of a rheumatic character-multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch." *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996).

Ms. Whelchel returned to the pain clinic on March 22, 2002, with complaints of muscle spasm in her upper back and shoulders. (R. 226). Dr. Niemeyer noted segmental motion abnormalities in the thoracic spine, several palpable trigger points. (R. 226). There was acute myofascial pain but, again, Dr. Niemeyer deferred any fibromyalgia examination. (R. 226). He injected Ms. Whelchel at each of her trigger points with lidocaine, and sent her for a physical therapy session for ultrasound. (R. 226).

In April 2002, Dr. Niemeyer reported that Ms. Whelchel had injured her right shoulder wile working in the Wal-Mart bakery. (Tr. 223). Range of motion in the shoulder was diminished secondary to pain. (R. 223). She was advised to rest the right arm when possible. (Tr. 222). Dr. Niemeyer changed her prescription from Celebrex to Anaprox and Tylenol #3. (R. 224). The doctor recommended that she stay home from work, but she feared her job might be in jeopardy if she did. (R. 224). Through the end of April, her back pain became acute. (R. 220). Dr. Niemeyer noted palpable trigger points on April 22nd, along with chronic myofascial changes through the thoracic and lumbar spine. (R. 220).

On May 10, 2002, Ms. Whelchel returned to Dr. Niemeyer's office with complaints of a migraine headache and overall join pain. (R. 219). Dr. Niemeyer told her she should not see him for acute medical problems. (R. 219). Ms. Whelchel was also seeing a chiropractor, a massage therapist, and a physical therapist. (R. 219). On May 20th, Ms. Whelchel's range of motion in her neck was limited to 70% of normal flexion, and 30% of normal extension. (R. 217). Range of motion in her lumbar spine was 70% of normal flexion and just 15% of normal extension. (R. 217). Straight leg raising was positive on the right. (R. 217). There were chronic paraspinal changes

4

throughout her back. (R. 217). By the end of the month, Tylenol #3 was no longer effective, and Dr. Niemeyer switched Ms. Whelchel's prescription to OxyContin. (R. 215). She continued to complain of pain, and there were chronic myofascial changes throughout her spine, with widespread polyarthralgia. (R. 213).

On May 22nd and 24th, Dr. Niemeyer again scolded her for coming to see him with complaints she should address to her primary care physician – gastritis – and advised her to comply with his recommended home exercise program. (R. 212-13). Ms. Whelchel complained that her pain was getting worse. (R. 212). She was suffering from edema, for which she was taking Dyazide. (R. 212). Dr. Niemeyer said she should educate herself about fibromyalgia. (R. 212). Then, on May31st, Ms. Whelchel reported that she felt great. (R. 210). There were still chronic myofascial changes and palpable tender spots in her back, but no trigger points. (R 210). By June 7, 2002, she was again suffering general musculoskeletal pain. (R. 207).

Ms. Whelchel's right shoulder pain returned in July of 2002. (R. 199). Range of motion was limited and strength was diminished. (R. 199). Dr. Niemeyer injected her with Kenalog, a steroid, and lidocaine, and prescribed Anaprox DS and Tylenol #3. (R. 199-200). He told her to avoid any activity that require raising her arm above the chest level. (R. 200).

On July 12, Ms. Whelchel returned and Dr. Niemeyer noted that she had not followed any of his recommendations. She was not using a splint for her wrist and apparently she had continued to use the arm, apparently having returned to work. (R. 194). She had not followed up with her primary care physician. (R. 194). X-rays showed some degenerative changes in the right wrist, and examination was consistent

with abnormal build up of fluid. (R. 194). Dr. Niemeyer gave her note for restricted duty at work in light of her right arm. (R. 195). He placed her back on Tylenol #3. (R. 197).

By August, the pain had migrated down Ms. Whelchel's right forearm. (R. 196). Dr. Niemeyer diagnosed wrist synovitis and flexor tendinitis and prescribed a wrist splint. (R. 197). Carpal tunnel signs were negative, but there was tenderness in the wrist and base of the thumb. (R. 196). Range of motion was restricted in the long finger. (R. 196). Dr. Niemeyer felt the problem was likely from repetitive use; the arm had to be rested and immobilized. (R. 197). In addition, based on some of the other symptoms Ms. Whelchel discussed, he felt she might have some type of endocrinologic problem. (R. 197). For that, Dr. Niemeyer, once again, instructed her to see her primary care physician. (R. 198). He was greatly concerned with the complaints that had totaled up in the short time he had been seeing Ms. Whelchel. (R. 198). A follow-up exam in September 2002 revealed chronic changes throughout the spine, and underlying somatic dysfunction throughout. (R. 193).

Ms. Whelchel complained of new shoulder pain in November 2002, and Dr. Niemeyer diagnosed acromioclavicle impingement and rotator cuff tendinitis of the right shoulder (Tr. 185). He gave her a home exercise plan (Tr. 186). Plaintiff denied stomach problems due to medications (Tr. 186). Range of motion in the joint was limited to about 70% of normal. (R. 185). Strength was reduced to 50% of normal. (R. 185). Examination was positive for outlet impingement and acromioclavicular impingement syndromes. (R. 185).

6

Ms. Whelchel's shoulder problems persisted through December. Range of motion was limited, and strength was diminished to about 40%. (R. 183). There was even some diminished strength in the left arm, but Dr. Niemeyer felt Ms. Whelchel might not be giving full effort. (R. 183). He said he would ordinarily give her another injection, but she was suffering from a respiratory infection. (R. 183). He wondered if she was doing her home exercises as her range of motion was worsening. (R. 183, 187). The doctor again prescribed Tylenol #3 for her pain. (R. 187).

On December 7, 2002, Ms. Whelchel returned with complaints of shoulder pain and marked restriction of motion. (R. 178). Dr. Niemeyer provided her with another injection of Kenalog and lidocaine. (R. 179). At that time, Ms. Whelchel was taking Tylenol #3, Anaprox, Prevacid and Reglan(for acid reflux or nausea), albuterol (a bronchodilator), as well as medications for persistent sinus and respiratory problems. (R. 178). Ms. Whelchel continued to have shoulder pain and limited motion through the end of the month. (R. 176). It was aggravated by driving – her car was a standard transmission – but the doctor noted that she lived in a remote area. Dr. Niemeyer gave her two more injections of Kenalog and lidocaine. (R. 177). There were apparent problems with her immune system, as she had developed two cases of thrush in less than a year, one in response to a course of antibiotics and one in response to the steroid injections. (R. 174). The doctor stressed, yet again, that she must see her primary care physician. (R. 174).

On December 20, 2002, Ms. Whelchel had a new complaint: right leg pain. (R. 170). Ms. Whelchel was uncooperative with Dr. Niemeyer's exam, and he felt she was exhibited some magnified pain behavior as to her leg. (R. 171). Nevertheless, he

diagnosed hip bursitis. (R. 171). He could not give her an injection because of her continuing case of thrush. (R. 172). He refilled her Tylenol #3 prescription and gave her a prescription for Dilaudid. (R. 172). When she returned on December 23, 2002, complaining bitterly of knee pain, he did inject her with Kenalog and lidocaine. (R. 168). At the time, Dr, Niemeyer indicated that her knee complaints were complicated in that no part of her physical examination fit the classical picture. (R. 168).

Plaintiff had multiple hospital and emergency room visits during her treatment with Dr. Niemeyer and for a few months thereafter. She was hospitalized for dehydration in July 2002. (Tr. 201). She was seen in the emergency room in November and December 2002 for an upper respiratory infection and abdominal discomfort. (Tr. 269-83). She also had swelling in her neck, face, abdomen and legs. (R. 270). Blood workups, were unremarkable however. (R. 270). She was hospitalized in January 2003 with generalized swelling, and at that time, doctors suspected Cushing's syndrome. (R. 312). An echocardiogram showed mild concentric left ventricular hypertrophy and mild mitral valve and trace tricuspid regurgitation. (R. 343).

Ms. Whelchel was hospitalized again in February of 2003, complaining of shortness of breath and continued swelling. Testing suggested adrenal insufficiency presumably due to exogenous steroid therapy. (R. 333). Studies also revealed an enlarged thyroid and a small abnormality in the pituitary gland. (R. 333). Ms. Whelchel was said to have "a variety of endocrine problems" and doctors were "concerned over the fact that [she] did receive fairly large doses of parenteral steroid." (R. 334). They also noted the probability of underlying musculoskeletal problems that would recur in the future. (R. 334). She was diagnosed with Cushing's Syndrome secondary to exogenous

8

steroid injection, deep venous thrombosis and pulmonary embolus. (Tr. 334). She was given Prednisone, Coumadin, and Lasix. (R. 398). Ms. Whelchel was also hospitalized in March 2003 for shortness of breath and chest pains. (Tr. 398-420). Here legs were swollen and she had pitting edema. (R. 399). Coumadin and Lasix were increased. (R. 400).

Ms. Whelchel had an abnormal gall bladder and blood chemistry studies in May of 2003, and a subsequent a cholecystectomy in July. (R. 491, 507). She continued to suffer from Cushing's syndrome through April 2003 (R. 525), May of 2004 (R. 738), and June of 2005. (R. 728). In June of 2003, a right heart catheterization was unremarkable; it was likely that Ms. Whelchel's continued shortness of breath was not cardiac in origin. (R. 525-527). She was hospitalized in May of 2005 for diverticulitis of the colon, and in August of 2005 for bronchitis. (R. 645-658).

In April of 2003, the Agency arranged for Dr. Mark Langgut to perform a consultative psychological examination of Ms. Whelchel. (R. 439-42). She described sadness and feelings of hopelessness, and reported that, while able to perform a full range of activities of daily living in the past, she was no longer able to do many things due to her physical condition and the related emotional toll. (R.. 439-40). She had several friends and got along adequately with others. (R. 440). She was angry with her former doctor, but her emotional presentation was within normal limits. (R. 440). Ms. Whelchel demonstrated variable memory skills; she could remember five digits forward and three digits backward, indicating a somewhat impaired recall ability. (R. 440). Her long-term memory was impaired – she could recall only "Bush" as a recent president. (R. 441). She named five large cities as "Chicago, Los Angeles, and Wisconsin." (R. 441). Her

abstract reasoning and higher order thought processes appeared deteriorated and regressed. (R. 441). Judgment appeared to be intact and she was fully oriented (Tr. 441). Intelligence testing produced a Verbal IQ of 73, a Performance IQ of 70, and a Full Scale IQ of 69 (Tr. 441). That placed her in the lowest 2% of the population and indicating she was functioning at a mentally deficient level. (R. 441). Dr. Langgut suspected that Ms. Whelchel's IQ scores might reflect deterioration in her intellectual ability over time as a function of depression. (Tr. 441). He said she had "few areas of cognitive competency at this time and may be overwhelmed with modest tasks, decision making and reasoning. (R. 441). Dr. Langgut diagnosed a dysthymic disorder, generalized anxiety disorder, and mentally deficient intellectual functioning (Tr. 442). He opined that her ability to work was significantly impaired as a result of her intellectual limitations as well as the difficulties and physical condition (Tr. 442).

In November 2005, family practitioner Dr. McVay reported that he was Ms. Whelchel's long-time treating physician (Tr. 725). He began treating her for arthritic neck, back, shoulder, and knee pain in 1990. (Tr. 725). Dr. McVay reported that Ms. Whelchel stopped working in early 2001 because it was becoming difficult to stand at her job due to increasing back and leg pain as well as progressive foot and ankle swelling (Tr. 725). She developed more and more problematic lower extremity edema and occasional shortness of breath. (Tr. 725). She developed Cushing's Syndrome after being given high doses of steroids for pain. (Tr. 725). After a change in medical management the problems associated with steroids began to abate and finally stabilized in November 2005. (Tr. 726).

Dr. McVay explained that, in February 2003 Ms. Whelchel developed bilateral pulmonary emboli secondary to deep vein thrombosis in the legs and was discovered to have Factor V Leyden Deficiency, meaning she was genetically predisposed to recurrent venous thrombosis. (Tr. 726). She continued to require management of hypothyroidism, hypertension, diabetes, and potential for deep vein thrombosis. (Tr. 726). Her activity tolerance was limited by back, leg, and shoulder pain, congestive heart failure, chronic obstructive lung disease causing dyspnea with only mild exertion. (Tr. 726). She gained a significant amount of weight due to Cushings and has not been able to lose it due to her severely limited activity tolerance and ongoing metabolic issues. (R. 726). Her prognosis was bleak, and her condition was expected to worsen over time. (Tr. 727).

Dr. McVay stated that Ms. Whelchel's condition "precludes her involvement in almost all of the activities of daily living. The tasks such as cooking, cleaning, and clothes washing have all become the responsibility of her husband who also holds a full-time job." (Tr. 727). Dr. McVay was "certain" that she "exceeds the requirements for a 'Disability' determination" and opined that Plaintiff was "not physically capable of any gainful employment beginning in early 2001." (Tr. 727).

In May of 2003, an Agency physician and a psychologist reviewed Ms. Whelchel's medical records. From a psychological standpoint, Dr. Brister found her to be, at most, moderately limited in her ability to understand and carry out detailed instructions and to concentrate for extended periods. (R. 446-48). There were no significant restrictions on any other area of her mental functioning. (R. 446-48). Dr. Brister also rejected Dr. Langgut's IQ testing because Ms. Whelchel had been able to work in the past. (R. 448). From a physical standpoint, Dr. Belinsky acknowledged that

11

Ms. Whelchel suffered from diabetes, pulmonary emboli, obesity, rheumatoid arthritis, fibromyalgia, goiter, swelling of her legs, and shortness of breath. (R. 518). Nevertheless, she felt she could lift twenty pounds occasionally and stand for six hours a day. (R. 518).

## C.

### Administrative Hearing Testimony

### 1.

### Plaintiff's Testimony

Ms. Whelchel testified that she could not recall when she last worked – sometime in 2002. (R. 921-24). She was fired from her last job making doughnuts because she was sick too many days, but also said they quit making donuts at the store. (Tr. 926, 948). The people at the store also did not like the way she looked due to her Cushing's syndrome. (R. 948). She stopped looking for another job after she swelled up with fluid and had a blood clot in her leg. (Tr. 926).

Ms. Whelchel complained of dizziness, back pain, leg cramps, leg numbness, numbness in her hands, and breathing problems. (R. 929, 930). She testified that she has problems using stairs and seldom drove. (R. 920, 927, 929). Her back bothered her all of her life, but it had worsened since she developed Cushing's Syndrome. (Tr. 930). She has seen a chiropractor since childhood. (R. 944). She has tightness in her chest and problems breathing. (R. 932-33). Ms. Whelchel said she has trouble sitting, standing, and walking. (R.927). She can sit about half an hour and stand about 15 minutes. (R. 933). She lies down a couple of times a day. (R. 937, 940). She can hold a fork but had trouble cutting meat. (R. 931). She tries to do some cooking but her husband has to help her, lifting

12

heavier things and cutting and peeling food. (R. 931). She is able to lift only a light book. (R. 934).

Ms. Whelchel does word search puzzles. (R. 932), but it takes her "forever" to read a newspaper. (R. 945). She types with one finger. (R. 948). She shops for groceries, but requires help from her husband or son lifting items like a gallon of milk. (R. 934). Her husband helps her in and out of the shower and in getting dressed. (R. 934). She can walk about half a block, and she walks in the yard. (R. 935). She watches television, makes peanut butter and jelly for her son, does a few dishes, leaving the heavier things like pans for her husband. (R. 936-37). Her husband does the laundry – she has difficulty going down the stairs to the washing machine – but she can hang some clothes. (R. 937). He folds towels and jeans. (R. 937). He also does the vacuuming, and her son does the mopping. (R. 938). She tries to attend church every week. (R. 939).

Ms. Whelchel testified that her medications caused her to throw up, caused spottiness of her fingers, and made her "shaky." (Tr. 927, 943). Her doctor had tried adjusting the medications. (Tr. 928). The costs of her treatments and medications have become prohibitive. (R. 928).

In closing, Ms. Whelchel said that she would really like to be able to work. "If [she] could work, [she'd] be out there tomorrow working because that is just the way [she] was always. " (R. 960). She said she hated the fact that she could no longer work, and wished she was not so sick that she was unable to. (R. 960).

13

### Plaintiff's Husband's Testimony

Ms. Whelchel's husband, Kirk, testified that he brought laundry up from the basement and helped her put it away, but that his wife folded the clothes. (Tr. 962). She sometimes shops for groceries by herself, but other times he goes with her. (Tr. 962). She has a hard time breathing and walking when she shops. (R. 963). Sometimes she waters the garden and tries to pull some weeds. (Tr. 963). Mr. Whelchel testified that his wife can cook without his help sometimes, but she has problems standing too long in the kitchen. (R. 963).

### 3.

### Vocational Expert's Testimony

Jennie Chin testified as a vocational expert ("VE"). The ALJ asked Ms. Chin whether a hypothetical individual with Ms. Whelchel's work history; who was capable of performing a full range of sedentary work; with the need for a sit/stand option; unable to climb, push, or pull; able to perform postural functions occasionally; able to perform manipulative functions frequently; and a limitation to the performance of simple and repetitive tasks could perform any of Ms. Whelchel's past relevant work. (R. 950). Ms. Chin said such an individual could not perform any of Ms. Whelchel's past work. (R. 950). Asked whether there were any other unskilled jobs that such a person could perform, Ms. Chin said accounting clerk, receptionist, office clerk, production worker, and packer. (R. 951). If such a person could only perform manipulations with their dominant arm on an occasional level, however, all those jobs would be eliminated. (R. 953). If the person could not maintain production pace, or had to take repeated sick days,

they would not be able to keep a job. (R. 955). And a new employee would not be allowed any missed time. (R. 956).

## III.

## THE ALJ'S DECISION

The ALJ found that Ms. Whelchel had not engaged in substantial gainful activity since May 1, 2002, the date she alleges she became disabled. (R. 22, 26). Next, he determined that Ms. Whelchel had the following severe impairments: Cushing syndrome, history of pulmonary embolism, generalized arthritis, depression, and borderline intellectual functioning. (R. 22, 26). These impairments, according to the ALJ, met the Agency's requirement that a severe impairment significantly limit the ability to perform basic work activities. (*Id.*). *See* 20 C.F.R. §§ 404.1520(c). But he also found that none of Ms. Whelchel's impairments, either singly or in combination, met or equaled an impairment listed in the Agency's regulations as disabling. (R. 30). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing of Impairments.

The ALJ acknowledged that Ms. Whelchel had been hospitalized repeatedly dues to her many impairments, but found the "longitudinal medical record . . . not consistent with a finding of complete disability." (R. 23). He felt the evidence demonstrated that she could perform a range of sedentary work no later than April 2003. Hospital stays at that point were for minor problems. (R. 23). The ALJ further concluded that, although Ms. Whelchel certainly had medically determinable impairments that could produce the symptoms she alleged, she was exaggerating. (R. 23). He listed several factors adversely affecting her credibility. She did not take strong codeine or morphine based pain medication, she has not continued visits to the pain clinic or sought treatment such as

physical therapy or a TENS unit. She has not quit smoking. She could not recall when her job at Walmart ended. Her husband refuted her statements that she only does yard work or cooks with his help. She was able to drive, climb steps, walk in her yard, go to church, do some dishes, and play computer games with her son. And, the ALJ noted that Dr. Niemeyer had said on one occasion that he thought she was exaggerating her symptoms. (R. 24).

The ALJ rejected the opinion of Ms. Whelchel's treating physician that she is disabled. He said it was based on her version of her limited activities, which are not credible. The doctor had the wrong date for when Ms. Whelchel stopped working. He submitted only medical records from 2003 on. The longitudinal record, according to the ALJ was consistent with a capacity for sedentary work, not disability as Dr. McVay had found. (R. 24). The ALJ also rejected the opinion of Dr. Langgut that Ms. Whelchel was disabled. He acknowledged the IQ score of 69, but found she was actually functioning at a higher level given her past "skilled work" frying hamburgers and making donuts at Walmart. (R. 25). Her activities were only mildly restricted, and "[t]here was no record of evictions, altercations, or severe social isolation." (R. 25). She attends church and her son's school events. She can recall five digits forward and three backward. (R. 25).

The ALJ concluded that Ms. Whelchel was limited to simple and repetitive sedentary work. That meant she could not return to any of her past work, including making donuts. The ALJ looked to the Medical Vocational guidelines as a framework, stating that Ms. Whelchel, was a younger individual with a high school education, and found that Rule 210.28 would direct a finding of not disabled if she could perform a full range of sedentary work. (R. 25). He then added that the VE had testified that an

16

individual who could perform simple, repetitive sedentary work, with a sit/stand option, requiring frequent manipulation, but no climbing, and occasional stooping, kneeling, crouching, and crawling, could perform work as a production worker or an office clerk. (R. 27). As a result, the ALJ found that Ms. Whelchel was not disabled and not entitled to DIB under the Act before that date. (R. 30-31).

## IV.

## DISCUSSION

### A.

### Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the Social Security Administration. *Berger*, 516 F.3d at 544; *Binion on behalf of Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Binion*, 108 F.3d at 782. Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber

stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). In order for the court to affirm a denial of benefits, the ALJ must "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ "must build an accurate and logical bridge from [the] evidence to [the] conclusion." *Dixon*, 270 F.3d at 1176; *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the plaintiff a meaningful judicial review. *Scott*, 297 F.3d at 595. In other words, as with any well-reasoned decision, the ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade. *Berger*, 516 F.3d at 544.

## B.

### Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff is unable to perform any other work in the national economy.

20 C.F.R. §§ 404.1520; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005); *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the plaintiff is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1989). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The plaintiff bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater*, 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.

## Analysis

Ms. Whelchel's treating physician cataloged her medical problems as follows: rheumatoid arthritis and osteoarthritis, diabetes mellitus (non-insulin dependent), hypertension, chronic congestive heart failure, hypothyroidism, steroid myopathy, gastroesophageal reflux disease, factor V Leyden deficiency, post deep venous thrombosis, post pulmonary embolus, lower extremity venous insufficiency, Cushing's syndrome, fibromyalgia, and obesity. (R. 726). She has sought treatment for pain stemming from these conditions through strong pain medication, chiropractic adjustment, steroid injections, and massage therapy. Add to her physical ailments a full scale IQ of 69 (R. 441), a high school education gained through special classes, repeated hospitalizations, repeated doctor's restrictions on work and repeated excuses from work, and the picture is not one of a person who will be able to do a job as an office clerk or a production line worker. It is more reminiscent of cases like *Mendez v. Barnhart*, 439

19

F.3d 360 (7th Cir. 2006); *Gentle v. Barnhart*, 430 F.3d 865 (7th Cir. 2005); or *Sarchet, supra.*; an unfortunate combination of impairments, with perhaps no single one disabling, but each one aggravating the next for a severely limiting cumulative effect. But the issue here is whether, in this specific instance, the ALJ's decision is supported by substantial evidence and his reasoning is sufficiently articulated. For the following reasons I find it is neither, and remand this case to the Commissioner for further proceedings.

### 1.

### Plaintiff's Mental Status

First, the ALJ's findings with regard to Ms. Whelchel's mental status cannot be sustained. His discussion of her mental status begins with his finding, at step three, that Ms. Whelchel does not have an impairment that meets or equals the listings provides a starting point. The ALJ said that Ms. Whelchel did not meet 12.05 for mental retardation or "significantly subaverage general intellectual functioning." 20 C.F.R. Pt. 404, Subpt. P, App. 1. His determination was not incorrect. Although his reasoning was different, the listing requires evidence that the claimant's mental "deficits" were manifested before the age of 22. *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006)(Posner, J). There is no evidence of that here, although Ms. Whelchel was schooled in special education classes in grammar and high school.

But it is worth noting that Listing 12.05 can be met with an IQ of 70 or less and "a physical or other mental impairment imposing an additional and significant work-related limitation of function." Ms. Whelchel has a laundry list of those, with the ALJ conceding that Cushing syndrome, history of pulmonary embolism, generalized arthritis, and depression were all significantly limiting. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1,

12.00A ("For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a "severe" impairment(s), as defined in §§ 404.1520(c) and 416.920(c). If the additional impairment(s) does not cause limitations that are "severe"..., we will not find that the additional impairment(s) imposes "an additional and significant work-related limitation of function ...."). She does not meet the listing for a condition the Commissioner concedes to be presumptively disabling, but she is certainly close.

A more troubling aspect of the ALJ's treatment of Ms. Whelchel's mental impairment was his rejection of Dr. Langgut's conclusion that she was disabled. It was based on testing that revealed Ms. Whelchel was functioning at a mentally deficient level, that her memory was impaired, that her abstract reasoning and thought processes were deteriorated and regressed, and that she had few areas of cognitive competency and may be overwhelmed by even modest tasks. The ALJ gave no weight to these findings because Ms. Whelchel had worked in the past.

Dr. Langgut is considered an "examining source," which means his opinion is entitled to more weight than those of the Agency reviewers that the ALJ rejected out of hand. 20 C.F.R. § 404.1527(d)(2). His opinion is based on testing and well-explained, which ought to lend it even more weight. 20 C.F.R. § 404.1527(d)(3). What is more, it is uncontradicted by any other examining or treating opinion in the record. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir.1994)("The ALJ cannot, without sufficient explanation, discount an uncontradicted, dispositive medical opinion."). This is not a case of "dueling doctors" in which the ALJ must decide whom to believe. *See Books v.*

21

*Chater*, 91 F.3d 972, 979 (7th Cir.1996); *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir.1995).

The reasoning the ALJ gave for rejecting Dr. Langgut's opinion is insufficient. The Seventh Circuit has emphasized that "employment is not proof positive of ability to work, since disabled people, if desperate (or employed by an altruist), can often hold a job." *Wilder v. Apfel*, 153 F.3d 799, 801 (7th Cir. 1998)(Posner, C.J.);*Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005)(Posner, J.)("A person can be totally disabled for purposes of entitlement to social security benefits even if, because of an indulgent employer or circumstances of desperation, he is in fact working."). Ms. Whelchel certainly appears to fit this profile, as she was already receiving DIB for disabling arthritis but chose to return to the work force. Moreover, the Agency reviewer rejected Dr. Langgut's report for the same reason the ALJ did – Ms. Whelchel had worked in the past. That is one of the reports the ALJ said did not deserve significant weight, while at the same time echoing it in rejecting Dr. Langgut's opinion.

Moreover, the IQ testing was not the only basis for Dr. Langgut's opinion, his psychological examination of her informed his opinion as well. She had a somewhat impaired short-term memory, her long-term memory was impaired and slow and inefficient, her access to learned information was slow and limited, her abstract reasoning and higher order thought were deteriorated and regressed, and she had limited arithmetic skills and her ability to manage her funds was quite poor. The ALJ ignored this portion of Dr. Langgut's report, and focused Ms. Whelchel telling Dr. Langgut that she had several friends and got along with her family, and could remember five digits forward and three backward. An ALJ may not simply select and discuss only that evidence which

favors his ultimate conclusion. *Smith v. Apfel*, 231 F.3d 433, 438 (7th Cir. 2000); *Herron v. Shalala*, 19 F.3d 329, 334 (7th Cir. 1994).

The ALJ's treatment of the only opinion in the record regarding Ms. Whelchel's mental capacities based on examination and testing infects the balance of his decision. The only mental limitation he includes in his hypothetical to the VE is that she is limited to performing simple, repetitive tasks. (R. 950). Thus stated, the hypothetical prompted a response that Ms. Whelchel could perform a variety of jobs including general office clerk and, worse, account clerk. This despite the fact that the only psychological examination on record indicated that Ms. Whelchel could not manage her own funds. And production line jobs for a woman who may be overwhelmed by even modest tasks? Not likely given the VE's testimony about the requirements of maintaining production rates in such jobs. (R. 954-55).[2] Despite the fact that there was a single, supported mental evaluation in the record, the ALJ made his own evaluation of Ms. Whelchel's mental status – playing, if not doctor, then psychologist. *See Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007)(". . . an ALJ cannot play the role of doctor and interpret medical evidence when he or she is not qualified to do so. . . . [a]nd . . . an ALJ cannot disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion).

## 2.

## The ALJ's Credibility Finding

---

[2] It should also be noted that the ALJ found that Ms. Whelchel had a high school education, and applied the Medical-Vocational Guidelines as a framework based on that characterization. In fact the evidence suggest she was in special education classes during the entire course of her schooling. While it is true that ALJ applied the Guidelines only as a framework, his inaccurate description of Ms. Whelchel's education, *see Cowger v. Commissioner, Social Sec. Admin.*, 2008 WL 754285, *11 (D.Idaho Mar. 19, 2008), demonstrates how his flawed consideration of the evidence regarding Ms. Whelchel's mental status undermines the entirety of his opinion.

The ALJ determined that Ms. Whelchel's complaints were not credible for several reasons: she has not suffered abnormal weight loss or muscle atrophy; she does not take codeine or morphine based pain medication; she has not undergone continuing treatment such as attending a pain clinic, physical therapy, or using a TENS unit; she has not quit smoking; her hearing testimony was inconsistent; Dr. Niemeyer thought she was magnifying her symptoms. (R. 24). Under SSR 96-7p, these may all be valid considerations, *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006), but the ALJ's characterization of the record is less that accurate, and it seems as though he might have ignored certain evidence in the record that undermines his finding. *See Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007)(ALJ is required to consider al of the evidence in the case record in making his credibility determination). An ALJ's credibility finding "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight . . . ." *Id. (quoting Zurawski v. Heckler*, 245 F.3d 881, 887 (7th Cir. 2001).

First of all, the ALJ's concern over the lack of weight loss and atrophy ought to have been assuaged by the medical evidence detailing Ms. Whelchel's extended bout with Cushing's syndrome. Dr. McVay could not have made it clearer in his report – Ms. Whelchel's obesity was tied to the disease. *Cf. Sarchet v. Chater*, 78 F.3d 305, 307 (C.A.7 (Ill.),1996)(Posner, C.J.)("The administrative law judge also depreciated the gravity of Sarchet's fibromyalgia because of the lack of any evidence of objectively discernible symptoms, such as a swelling of the joints. Since swelling of the joints is not

a symptom of fibromyalgia, its absence is no more indicative that the patient's fibromyalgia is not disabling than the absence of headache is an indication that a patient's prostate cancer is not advanced."). It is not clear the ALJ even considered this.

In addition, from his opinion, it is also not clear the ALJ gave due consideration to Ms. Whelchel's treatment. Ms. Whelchel has taken a variety of medications including codeine based medications such as Tylenol 3 and other strong pain relievers such as Dilaudid and OxyContin. One might be abandoned for another as its effects waned, but the veritable pharmacy that has been Ms. Whelchel's medicine cabinet is no evidence that her condition is not as severe as she says. Ms. Whelchel sought treatment for at least a year from a pain clinic, including various prescriptions for pain medication and steroid injections. During that period she saw a chiropractor, a massage therapist, and a physical therapist.

That she did not continue on at the pain clinic – if that is what the ALJ means – is understandable because the doctor's treatment there resulted in Cushing's syndrome. Moreover, the record is clear that she has discontinued some of her treatment due to the costs (R. 731)– she is unemployed, after all. *See* SSR 96-7p(setting forth examples for why a claimant may not seek medical treatment, including "... the individual may be unable to afford treatment and may not have access to free or low-cost medical services.").

Then there is Ms. Whelchel's testimony regarding her daily activities. The Seventh Circuit has cautioned that an ALJ ought not to overlooking the differences between household and labor-market work. *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005); *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006)(with regard to a mental

impairment); *Carradine v. Barnhart*, 360 F.3d 751, 756 (7th Cir. 2004)(sporadic activities are not necessarily transferable to the work setting with regard to the impact of pain). Ms. Whelchel might be able to drive from time to time but it would seem to be a necessity because of where she lives. Sometimes she is able to climb stairs, do dishes, take a short walk, but sometimes she is not. She has a flexibility at home that she would not enjoy at work, as both the applicable case law, *Gentle*, 430 F.3d at 867-68, and the testimony of the VE (R. 952-56) indicate.

Ms. Whelchel could not remember when her job at Walmart ended. The ALJ chose to find that this undermined her credibility. It is difficult to see how. Memory is fallible and often plays tricks *Jarad v. Gonzales*, 461 F.3d 867, 870 (7th Cir.2006); *Kadia v. Gonzales*, 501 F.3d 817, 822 (7th Cir.2007). That it was here was consistent with the plaintiff's overall difficulties. The ALJ's conclusion on this score might have been another unfortunate product of his improper disregard for Dr. Langgut's opinion. In it, Dr. Langgut was rather clear that Ms. Whelchel's short-term memory was impaired and her long-term memory was worse. For example, she could only remember "Bush" when asked to name as many recent presidents as she could.

Finally, as Ms. Whelchel points out, it is an odd choice to find her credibility undermined by a statement from the doctor who seems to have been responsible for her Cushing's syndrome. The statement to which the ALJ refers seems to be limited to Ms. Whelchel's complaints of knee pain (R. 171), so it would not be reason to discount her completely. More importantly, if Dr. Niemeyer truly felt that Ms. Whelchel's complaints were unfounded, why prescribe Tylenol #3, Dilaudid, and give her another steroid and lidocaine injection?

One further point is worth making about the ALJ's credibility finding. Under the Commissioner's regulations and SSR 96-7p, a claimant's work record is a valid consideration in the assessment of their credibility. 20 C.F.R. §§ 404.1529(c)(3). It is most often considered in the negative, as with a claimant who has a spotty work record. In those cases, courts have cautioned ALJs to explore the record for possible excuses for a claimant's failure to work consistently. *See Sarchet,* 78 F.3d at 308 (ALJ erred in discounting claimant's credibility based on work history where ALJ failed to consider claimant's minimal education, long list of medical ailments, and numerous medications); *Schaal v. Apfel,* 134 F.3d 496, 502 (2d Cir.1998) ("An ALJ should explore a claimant's prior work history to determine whether her absence from the workplace cannot be explained adequately (making appropriate a negative inference). This case is a little different. Ms. Whelchel worked until she was granted disability benefits due to arthritis – generally a degenerative disease – but later returned to the work force. She might have simply been content to continue receiving her DIB, but she went to work. At times, it appeared that she went so far as to ignore her doctor's instructions to limit her activity so that she hold down her job. The ALJ made no mention of this, and it seems it ought to at least have entered into his calculus. *See Schaal,* 134 F.3d at 502 (good work history may be deemed probative of credibility).

### 3.

### Plaintiff's Physical Problems

While the ALJ's treatment of Ms. Whelchel's mental impairment and his assessment of her credibility, without more, necessitate a remand, a couple of other

points are worth noting. The ALJ rejected Dr. McVay's opinion that Ms. Whelchel is disabled as a result of a host of physical problems. An ALJ's decision not to give controlling weight to a treating physician's opinion will be upheld where that physician did not have the requisite expertise, familiarity with the patient, or longitudinal relationship, or where the opinion was inconsistent with objective medical evidence like x-rays. *White v. Barnhart,* 415 F.3d 654, 658-59 (7th Cir.2005); *Skarbek v. Barnhart,* 390 F.3d 500, 503-04 (7th Cir.2004); *Scheck v. Barnhart,* 357 F.3d 697, 702 (7th Cir.2004). Here, the ALJ said he did not give controlling weight to Dr. McVay's opinion that Ms. Whelchel was "'severely impaired' by pain, shortness of breath, weight and peripheral vascular disease." (R. 24). This a bit of a truncated reading of Dr. McVay's three-page narrative of his treatment of Ms. Whelchel and her "globally deconditioned state," "multiple system disease," and "bleak prognosis." (R. 725-27). And while Dr, McVay's treatment notes might be cursory, they do reflect continued, consistent complaints of tiredness, malaise, and generalized back, joint, and muscle pain. (R. 691, 693, 695, 697, 700, 728). Dr. Niemeyer's treatment notes, covering some of the same time period, are a bit more detailed with clinical findings such as restricted motion, trigger points, myofascial changes, etc. But, it is not as though Dr. McVay's assessment is inconsistent with the other medical evidence.

Also, the ALJ made no mention of the references in the record to fibromyalgia. The Commissioner explains that this is because there was no definitive diagnosis in the record based on appropriate clinical findings. The ALJ did not say that, though, and it is not the analysis of the Commissioner's lawyers that is to be reviewed. *See Golembiewski v. Barnhart,* 322 F.3d 912, 916 (7th Cir. 2003)(" . . . general principles of administrative

law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."); *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002)(same). Three doctors indicated that Ms. Whelchel suffered from fibromyalgia. Dr. Niemeyer addressed it repeatedly and, although he deferred a full exam for it, he did note that Ms. Whelchel exhibited the trigger points associated with the malady. He went so far as to instruct her to educate herself about it. Ms. Whelchel's treating physician listed it as a diagnosis, perhaps due to the consisted complaints list above – tiredness, malaise, and generalized back, joint, and muscle pain. *See, supra,* at footnote 1. In any event, the ALJ ought to have mentioned it, and explained why he disregarded it.

## V.

## CONCLUSION

The plaintiff's motion for reversal and remand [25] is GRANTED, and the Commissioner's motion for summary judgment [27] is DENIED. This matter is remanded to the Commissioner for further proceeding consistent with this opinion.

**ENTERED:** _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 5/8/2008

29